LISA A. RASMUSSEN, ESQ.
Nevada Bar No. 007491
**LAW OFFICE OF LISA RASMUSSEN**
601 South 10th Street, Suite 100
Las Vegas, NV 89101
Telephone: (702) 471-1436
Facsimile: (702) 489-6619
Email: Lisa@LRasmussenLaw.com

*Attorneys For Plaintiff*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | ) Case No.: BK-S-09-32824-RCJ (Lead Case) |
| | ) |
| ASSET RESOLUTION, LLC, | ) Chapter 7 |
| | ) |
| Debtor. | ) Jointly Administered with Case Nos.: |
| | ) BK-S-09-32831-RCJ; BK-S-09-32839-RCJ; |
| | ) BK-S-09-32843-RCJ; BK-S-09-32844-RCJ; |
| THE B&B SETTLEMENT TRUST, | ) BK-S-09-32846-RCJ; BK-S-09-32849-RCJ; |
| | ) BK-S-09-32851-RCJ; BK-S-09-32853-RCJ; |
| Plaintiff, | ) BK-S-09-32868-RCJ; BK-S-09-32873-RCJ; |
| vs. | ) BK-S-09-32875-RCJ; BK-S-09-32878-RCJ; |
| | ) BK-S-09-32880-RCJ; BK-S-09-32882-RCJ |
| MCALAN DUNCAN, | ) |
| | ) Adversary No. 14-01032 |
| Defendant. | ) |
| | ) **QST'S OPPOSITION TO DEFENDANT'S** |
| | ) **MOTION FOR SUMMARY JUDGMENT** |
| | ) |

The B&B Settlement Trust ("QST") respectfully submits its Response in Opposition to

Defendant's Motion for Summary Judgment (the "Opposition"), as follows:

## I.

## <u>SUMMARY OF RESPONSE</u>

Duncan's motion for summary judgment (the "Motion") is yet another attempt in this

litigation to avoid the Court's review of the merits of complaints by thousands of direct lenders—

Duncan's clients—concerning his actions while he was their co-counsel in in the '892 case, the

Asset Resolution bankruptcy, the '210 case, and other related proceedings before this Court. The Motion must be denied for the following reasons:

(i)    The motion is premature. Although the parties have exchanged Rule 26 disclosures, no document requests have been served and no depositions have been taken (not even the deposition of Bickel & Brewer lawyer Michael Collins, whom Duncan insisted should be the first witness to be deposed—even before documents had been received from that firm). On January 30, 2015, the Court entered an order declaring that the QST could amend its Complaint to add the Claims Recovery Trust ("CRT") as a defendant in this case, which the QST intends to do. (ECF No. 143 at 4). The motion should therefore be denied under FRCP 56(f).

(ii)    Even without formal discovery being undertaken, the evidence shows that there are material issues of fact which preclude entry of a summary judgment.

## II.

## BACKGROUND FACTS

### A.  The QST And Its Role

The QST was created pursuant to the Court's October 19, 2012 order (the "Trust Creation Order") in order to "maximize the value of the settlement" approved by the Court in a September 2012 order (the "Settlement Order") to the Bickel & Brewer direct lenders (the "B&B DLs").

The B&B DLs are direct lenders who: (i) signed a retention agreement with B&B and/or Duncan.; (ii) were represented by B&B and Duncan in connection with the chapter 7 bankruptcy proceeding of Asset Resolution, LLC and related proceedings; and (iii) agreed to be bound by the Settlement Order and the liquidating trust agreement ("LTA") approved by the Court and attached as Exhibit A to the Settlement Order. [AR BK Doc. 1915]. There are currently 1,562 B&B DLs. They are all beneficiaries of the QST.  One of the QST's duties under the Settlement Order is to allocate the settlement funds, including payments for attorney's fees under the B&B DLs'

retention agreement with Bickel & Brewer ("B&B") and Duncan (the "Retention Agreement"). B&B and Duncan acted as co-counsel to the B&B DLs the '892 case, the Asset Resolution bankruptcy, the '210 case, and other related proceedings.

## B. Duncan And His Role

In April 2008, Duncan moved the Court in the 892 Case to approve a proposal by one of Duncan's "Cross" entities to enter into a "litigation management and servicing" agreement with the direct lenders. During the hearing on the motion, the Court found that Duncan's proposal was "just rape and pillage of the same people who were defrauded before. . . ." [*See* 892 Doc. 1735-1 (Transcript of Proceedings dated April 28, 2008) at 19/lines 20-24]. The Court therefore rejected the motion.

Duncan then asked to reappear in the '892 Case as "co-counsel" in March, 2009. The Court ruled that it would allow him to participate as a lawyer but admonished that Duncan could not receive a "grand gift of a 50-percent referral fee" and could only be paid for "his fair share of the litigation effort" as a duly-admitted lawyer for the case. [*See* March 16, 2009 Transcript at 113/lines 12-19]. The Court also noted in March 2009 that, to the extent Duncan "expects Cross to receive any kind of reimbursement from these folks, direct lenders, he also has a potential problem." [*See* 892 Case March 16, 2009 Transcript at 114/lines 6-14]

## C. The Dispute

The Retention Agreement is set forth on Bickel & Brewer's letterhead. It contains a two-prong contingency fee formula: (a)  35% of any savings from any servicing-related waterfall fees of default interest, late charges, and other fees being sought by Compass; and (b) 50% of the gross damages or disgorged fees from various defendants in the '892 case.

Late in 2013, the Court entered an order directing the Asset Resolution estate to distribute $4.5 million to the QST on behalf of the DLs. [*See* AR Bk Doc. 2399]. Meanwhile, the QST had

received complaints from DLs about paying any fees to Duncan, due to what the DLs alleged to be wrongful conduct of Duncan and his company, Cross.  *See* ECF No. 56 (Coulson Dec.); *see also* ECF No. 58 (Knoles Declaration).

On February 14, 2014, Bickel & Brewer confirmed in a letter to QST trustee Michel Coulson that any fees payable to B&B and Duncan under the Retention Agreement were "properly allocable" separately. *See* Declaration of Lisa Rasmussen, submitted herewith, Ex. 1. After receiving that confirmation, the QST, after setting aside $500,000 for expenses wholly unrelated to this litigation,[1] disbursed to B&B half of the remaining $4.5 distribution. The QST then filed this adversary proceeding as an interpleader action asking the Court to whom it should disburse the remaining $997,106.11 of settlement funds (the "Interplead Funds"). The Interplead Funds have been deposited with the Court. (*See* ECF No. 18). In the Court has since ruled in the Clarification Order that the QST has standing to seek a declaration and related relief.

### III.

### PROCEDURAL HISTORY

On February 27, 2015, the QST commenced this interpleader action by filing a complaint naming the Claims Recovery Trust ("CRT"), Duncan, and Cross FLS, LLC ("Cross") as defendants-in-interpleader. (ECF No. 1). The parties then filed a series of other pleadings, including third-party complaints, cross-claims, and counterclaims. (*See* ECF Nos. 4, 23, 26, 54, 61).  Seven motions to dismiss the various pleadings were filed in response. (*See* ECF Nos. 22, 24, 85, 86, 97, 99, 109)  On October 17, 2014, the Court, after hearing oral argument on the motions to dismiss, entered an order (the "MTD Order") granting in part and denying in part the two motions to dismiss directed to the QST's Complaint-In-Interpleader and granting five of the

---

[1] This money has been earmarked for asset preservation for the ARC estate and to cover the '210 Compass litigation expenses that Duncan has failed to pay.

motions to dismiss directed to the various other pleadings. (ECF No. 133 at 8). The Court ordered that the case would "proceed as a declaratory judgment action against Duncan pursuant to 28 U.S.C. § 1334(b), and the other Defendants [including the CRT] are DISMISSED." (*Id.*).

On November 14, 2014, the CRT filed a timely motion for clarification that  the Court's MTD Order did not dismiss the claims asserted by the CRT in this case against Duncan and Cross with prejudice, and asking the Court to sever its claims against Cross into a separate adversary proceeding (the "Motion To Clarify"). (*See* ECF No. 139).   Duncan and Cross filed an opposition on December 1, 2014, and the CRT filed a reply on December 12, 2014.  (*See* ECF Nos. 140 & 141)

Twelve days later, on December 24, 2014, Duncan filed his motion for summary judgment. (ECF No. 142).  Although the CRT was still in the case due to the pending Motion To Clarify, the certificate of service filed with Duncan's Motion shows that he did not serve the Motion on the CRT or its counsel. (ECF No. 142 at 23). Seven days later, on December 30, 2014, the Court entered an order granting the Motion To Clarify in part (the "Clarification Order"). (ECF No. 143).  Among other things, the Clarification Order allows the QST to "amend the Complaint to re-plead the interpleader action based on CRT's representation that it in fact challenges the payment to Duncan on behalf of one or more of its beneficiaries." (*Id*. at 4). The QST intends to file such an amended complaint on or before February 20, 2015 (i.e. in about two weeks).

## IV.

## STATUS OF DISCOVERY

### A.  Discovery  Has been Stayed Until December 30, 2014 And There Is No Discovery Order In Place

On August 13, 2014, the QST, CRT, Duncan, and Cross filed a joint report stipulating to certain matters relating to discovery in this case (the "Joint Report"). (ECF No. 119). At that time, the parties were unsure of the ultimate scope of discovery in light of the numerous then-pending

motions to dismiss. *Id.* at 2. The parties also had disagreements about how many depositions could be conducted, how long each could take, and how much time each party would be entitled to take with each witness.  They therefore agreed to stay any discovery "until the motions [were] ruled on by the Court." *Id.* The Joint Report also stipulated that "discovery shall not be undertaken until there is a discovery plan in place. (ECF No. 119).

The motions to dismiss were not fully resolved until the Court entered the Clarification Order on December 30, 2014.  The QST is also in the process of amending its Complaint per the Clarification Order. For those reasons, no discovery or scheduling order has yet been negotiated by the parties (let alone entered or even presented to the Magistrate). Also for those reasons, although the parties have exchanged initial Rule 26 statements (and Duncan has unilaterally produced some documents), the parties have not served any document requests, interrogatories, or any other discovery requests except one: a deposition notice served by Duncan of Bickel & Brewer lawyer Michael Collins. (ECF No. 121).  Rasmussen Dec, ¶ ¶ 2-6.

**B.      Duncan's Flip-Flop On The Importance Of The Collins Deposition**

The parties' Joint Report asked for judicial resolution of a "discovery dispute concerning an oral deposition of Bickel & Brewer lawyer Michael J. Collins." (ECF No. 119). Duncan's counsel had been demanding since at least May 27, 2014 that Collins' deposition be conducted immediately. The QST agreed that the Collins deposition would be necessary to resolve the disputes on the merits. However, in addition to the other reasons for agreeing to a discovery stay and requiring a Magistrate to rule on the issues noted above, the QST (and the CRT, which was still in the case at the time) had concerns about, protecting the attorney-client privilege of the direct lenders from being waived through a deposition of their present trial lawyer.

On September 11, 2014, Duncan noticed an oral deposition of Collins that set the deposition for October 6, 2014. (ECF No. 121). The notice was filed in violation of the parties'

agreement in the Joint Report that "discovery shall not be undertaken until there is a discovery plan in place" and that they would "request the Court's assistance in resolving their dispute" concerning the timing and scope of Mr. Collins' deposition at a September 25, 2014 status conference. *Id.* The deposition was then re-noticed twice by Duncan to accommodate Mr. Collin's schedule, once for October 22, 2014 and then for November 19, 2014. Meanwhile, counsel for the CRT (Francis B. Majorie) was communicating with the lawyers Bickel & Brewer had retained for the deposition (first, Amon Burton and then Pat Neligan) to address the privilege and other issues raised by the deposition. *See* Majorie Decl., Exs. A, C. He also circulated a draft order to address the discovery deadlines, deposition issues, and privilege/confidentiality concerns on October 10, 2014. See id., Ex. B. Counsel for the QST also contacted Mr. Neligan to start working on these issues in the second week of November, 2014.

Duncan never responded to the draft order submitted for review by Mr. Majorie. *Id.* Duncan's counsel never talked to the QST's counsel after the Court entered the MTD Order in October, 2014. Rather, Duncan apparently decided to ignore his previous agreements to work through the discovery issues needed for the case and use those agreements as a sword against the QST.  On December 24, 2014—Christmas Eve—Duncan filed the instant pre-discovery summary judgment Motion as if all discovery had been completed and the issues were ripe for resolution.

**V.**

**SUMMARY JUDGMENT SHOULD BE DENIED
AS PREMATURE UNDER FED. R. CIV. P. 56(d)**

**PURSUANT TO FRCP 56(F), QST HEREBY OBJECTS TO THE MOTION AND SEEKS AN ORDER EITHER DENYING THE MOTION WITHOUT PREJUDICE OR DIRECTING THAT IT BE HELD IN ABEYANCE UNTIL DISCOVERY IS COMPLETED AND A MORE COMPLETE RESPONSE CAN BE FILED.**

**A.    <u>Legal Standard</u>**

Federal Rule of Civil Procedure 56(d)[2] allows the Court to refuse summary judgment, allow time to take discovery, or "issue any other appropriate order" when a party opposing summary judgment demonstrates "by affidavit or declaration that . . . it cannot present facts essential to justify its opposition." FED. R. CIV. P. 56(d); *see also see also Texas Partners v. Conrock Co.*, 685 F.2d 1116, 1119 (9th Cir. 1982) (reversing summary judgment where plaintiffs were not afforded opportunity to proceed with discovery). Rule 56(d) thus provides a device for litigants to defeat summary judgment when they have not yet had sufficient time to develop affirmative evidence. *Burlington Northern Santa Fe Ry. Co. v. The Assiniboine*, 323 F.3d 767, 773 (9th Cir. 2003).

Fed. R. Civ. P. 56(d) expressly provides for the denial of summary judgment motions if the nonmoving party has not had an opportunity to make full discovery. *Celotex*, 477 U.S. at 326.1.[3] The purpose of this Rule is to guard against the improvident dismissal of valid claims pursuant to premature summary judgment motions, and thus it "'should be applied with a spirit of liberality.'" *United States v. Casino Magic Corp.*, 293 F.3d 419, 426 (8th Cir. 2002) (en banc) (quoting 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 3d. § 2740 (1998)).

A Rule 56(d) request for time to conduct discovery should be granted where the party making the request: (1) submits an affidavit setting forth the specific facts that they hope to obtain

---

[2]    Rule 56(d) contains the former provisions of Rule 56(f). See Fed. R. Civ. P. 56 advisory committee's 2010 amendment note.

[3]    Indeed, the very text of Rule 56 presumes that a party will have had access to discovery before being forced to respond to a motion for summary judgment. Rule 56(c) states that the Court should consider, *inter alia*, the "depositions, answers to interrogatories, and admissions on file" in assessing whether summary judgment is appropriate. *See also Boyd v. Wexler*, 275 F.3d 642, 647 (7th Cir. 2001) (criterion for summary judgment assumes that there will have been "evidence gathered in discovery").

from discovery (as the QST and its undersigned counsel have done here); (2) that the facts sought exist (as the declaration of Donna Cangelosi filed herewith demonstrates); and (3) that these facts are essential to oppose summary judgment (as is the case here). *State of Cal. v. Campbell*, 138 F.3d 772, 779 (9th Cir. 1998). Due to the infancy of this action, the specificity required of the QST in describing the facts likely to be discovered is not a stringent requirement. See *Burlington Northern*, 323 F.3d at 774 (explaining that, "where . . . no discovery whatsoever has taken place, the party making a Rule 56(d) motion cannot be expected to frame its motion with great specificity as to the kind of discovery likely to turn up useful information, as the ground for such specificity has not yet been laid").

**B.**     **The Motion Is Premature Because Discovery Has Yet To Be Conducted**

The timing of a motion for summary judgment is particularly significant when considering a Rule 56(d) request for more time. Where, as here, a summary judgment motion is brought early in the litigation, a Rule 56(d) motion for additional time should be granted as a matter of course. *Burlington Northern*, 323 F.3d at 774. In *Burlington Northern*, the Ninth Circuit reviewed the trial court's grant of a motion for summary judgment filed by plaintiff less than one month after the plaintiff initiated suit. The Ninth Circuit reversed, holding that the defendant's Rule 56(d) motion should have been granted insofar as the discovery sought was dispositive of a pivotal question in the action. *Id.* On the issue of timing, the Ninth Circuit counseled: "Where . . . a summary judgment motion is filed so early in the litigation, before a party has had any realistic opportunity to pursue discovery relating to its theory of the case, district courts should grant any Rule [56(d)] motion fairly freely." *Id.* at 773.

As is shown in section II above, Duncan's motion is premature and should be denied because the discovery process has not even begun in this matter. In contrast to his previous assertion that "[t]he Question is not whether the parties will need to have a discovery plan. Clearly

they will," (ECF No. 132 at 2).  Duncan's earlier judicial admission about the need for a discovery plan—and his agreement that discovery would not be conducted until such a plan was in pace—should be, by itself, enough to deny the present Motion as premature.

Duncan's admission and agreement about discovery also refutes his assertion that discovery has been delayed by the QST. The motions to dismiss have only been resolved about thirty days ago. Neither one of Duncan's two sets of lawyers has reached out to QST counsel to discuss a schedule for discovery or any other matter. *See* Rasmussen Declaration.  Instead, Duncan has chosen to lay behind the log until he could file a summary judgment motion on Christmas Eve. This kind of pre-discovery motion is precisely the type that Rule 56(d) is meant to guard against.

The procedural history of the case also counsel in favor of dismissing the pending summary judgment Motion as premature.  Although this case was filed approximately one year ago, resolution of who was in – and not in—the case and how the Court would interpret the nature of the Plaintiff's claims was not fully resolved until the Clarification Order was entered on December 30, 2014 (a little more than 30 days ago).  The QST has been granted leave to file an amended complaint which it intends to do within the next two weeks or so. The summary judgment Motion was filed *before* these events occurred.  The Court should therefore rule that the QST has not been afforded adequate time to develop facts in support of its Opposition. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (summary judgment appropriate when, "after adequate time for discovery," party fails to establish existence of essential element of party's case as to which he bears burden of proof); *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986) (plaintiff must present affirmative evidence to defeat proper motion for summary judgment "as long as the plaintiff has had a full opportunity to conduct discovery").  Like the plaintiff's motion in *Burlington Northern*, which was denied when filed one month after the case's commencement,

Duncan's motion for summary judgment, filed two months after the MTD Order was entered and before the Clarification Order was entered, has been made too early in this litigation.

**C.    Discovery Is Needed To Discover Numerous Essential Facts**

As detailed in the accompanying declaration of Lisa A. Rasmussen, the facts that the QST seeks to discover concern the following issues which are raised in the Motion and which would defeat summary judgment requested by Duncan:

(1)    Did B&B actually require as a condition of its retention that Duncan be retained to provide expertise which B&B did not have and believed it could not obtain for the issues in the 892 Case?

(2)    Did Duncan misrepresent to B&B that the DLs would not retain B&B unless Duncan was also retained for half of the fees?

(3)    Did Duncan misrepresent to the DLs that B&B would not accept retention by them unless Duncan was also hired for half the fees?

(4)    Did Duncan actually, personally, and on a timely basis advance all of the litigation expenses necessary for the proper representation of the DLs?

(5)    Did Duncan personally provide the legal services for which he claims he had special expertise or was that work provided by someone else in whole or in part?

(6)    Why did B&B state in its February 2014 letter to the QST that it was proper to separately allocate payments to B&B and payments to Duncan.  In other words, what exactly was/is the nature of the relationship between B&B and Duncan?

(7)    Do B&B and Duncan have a "separate agreement" which obligates B&B to pay over 50% of any contingency fee it receives from work for the DLs (as Duncan has alleged)?. If such a separate agreement exists, what is it, why does it exist (as

opposed to simply relying on the Retention Agreement), when was it reached, and why has it never been disclosed to the DLs?

(8) Does B&B believe that it has (and does B&B in fact and in law have) the power to forgo any future fees under the Retention Agreement such that neither B&B **nor Duncan** would be entitled to receive any more?

(9) Has B&B been threatened with suit by Duncan if B&B agrees to no longer receive fees from the 892 settlement? If so, what was said by whom, to whom, and why?

(10) How were responsibilities actually allocated between B&B and Duncan for the services? Were they jointly responsible as co-counsel or, as Duncan has alleged, was Duncan simply hired by B&B to provide expertise which B&B did not supposedly already have or could not attain?

(11) If Duncan only provided approximately twenty percent of the work up until the fee declarations were filed in the 892 Case (and has since contributed zero legal work), why is he entitled to receive half of the fees in perpetuity?

(12) Based on what Duncan has already been paid to date, would his acceptance of additional fees (including the fees held in the Court's registry) be excessive (and therefore not due)?

(13) Has Duncan breached his fiduciary duties to the direct lenders as their lawyer and/or engaged in self-dealing which would vitiate any "right" he may have to accept additional fees (and may, in fact, require disgorgement of fees already received)? Did that self-dealing include, for example, pushing through a loan resolution on the Fox Hills loan without a re-vote based on materially changed circumstances when Duncan/Cross would receive well over one million dollars from the transaction and the DLs would receive only pennies on the dollar? Did

that self-dealing also involve trying to fire-sale the Margarita loan when the ultimate resolution by the DLs themselves resulted in almost three times as much? Rasmussen Dec, ¶8.

Much of the information concerning the above issues will come from documents and testimony from at least two sources: (a) Duncan himself (who has yet to be deposed); and (b) Bickel & Brewer lawyers (including William A. Brewer and Michael J. Collins). Brewer is the senior partner and founder of B&B. Collins is the partner at B&B who was in charge of the B&B team representing the B&B DLs in several proceedings in front of this court. *See* Cangelosi Declaration, submitted herewith, ¶8. In May 2014, after various third-party complaints and/or counterclaims had been filed by Duncan and/or Cross accusing the QST, the CRT, Cangelosi, and/or other third parties of wrongdoing (the "Duncan/Cross Pleadings"), Cangelosi approached Collins and asked him to submit a deposition in support of the oppositions to the Duncan/Cross Pleadings. *Id.,* ¶¶ 12-14. A proposed declaration was drafted by Francis B. Majorie, counsel to the CRT, and sent to B&B for review. *Id.* Although Collins ultimately decided not to sign the declaration, it was understood that he would—and will if given an opportunity in the future, if this litigation is not ended prematurely by Duncan's pre-discovery summary judgment motion—to testify to the facts laid out in pages 3 to 6 of the declaration of Donna Cangelosi.

The anticipated testimony of Collins, as described in Cangelosi's declaration, is itself enough to contradict most of the 'material facts" in the Motion and summary judgment may be denied on that basis alone.[4]    *See* Cangelosi Dec.  But the QST also will be able to show the

---

[4] Collins' statements to Cangelosi may be considered by the Court in ruling on the summary judgment motion because the evidence will be presented in an admissible form at trial through Mr. Collins' testimony at a deposition or at trial. *See Williams v. Borough of West Chester*, 891 F.2d 458, 466 n. 12 (3d Cir.1989) ("hearsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present that evidence through direct testimony, i.e. 'in a form that would be admissible at trial.'").

existence of genuine issues for trial through discovery from various third parties, including

borrowers, guarantors, and their counsel who had interactions with Duncan and his company,

Cross. Such persons include, for example: (a) Kent Hoggan (the Fox Hills "representative" who

apparently claims he was misled by Cross into signing an unauthorized "Grant Deed" to facilitate

the Fox Hills sale); (b) Gregory Bock (another Fox Hills representative who testified in another

action that Duncan/Cross threatened suit "for" the DLs if they did not agree to go along with the

sale and set aside over one million of the proceeds to be carved up later); and (c) John King (the

Margarita loan principal who told Ms. Cangelosi that Duncan encouraged King to sue Cangelosi

for trying to obtain more money for the DLs than Duncan/Cross was proposing). *See* Cangelosi

Dec., ¶¶ 22-24.

　　For all the foregoing reasons, should the Court decide that Duncan's motion for summary

judgment has been filed prematurely and continue it until the parties complete discovery

## VI.

### THERE ARE NUMEROUS GENUINE ISSUES OF MATERIAL FACT THAT BAR DUNCAN TO JUDGMENT AS A MATTER OF LAW

**THE COURT SHOULD DENY DUNCAN'S PREMATURE MOTION FOR SUMMARY JUDGMENT BECAUSE OF THE EXISTENCE OF NUMEROUS GENUINE ISSUES OF MATERIAL FACT THAT PRECLUDE SUMMARY JUDGMENT.**

**A.    Legal Standard**

　　Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of law." FED. R.

CIV. P. 56(c). A material fact is one that could affect the outcome of the suit, and a genuine issue

is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). If

the evidence is such that a reasonable jury could return a verdict for the nonmoving party, summary judgment is not proper. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253 (1968). "All that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 288-89. If reasonable minds could differ as to the import of the evidence, summary judgment is not proper. *Wilkerson v. McCarthy*, 336 U.S. 53, 62 (1949). The judge's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter but only to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.

The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Alternatively, the movant can demonstrate that the non-moving party cannot provide evidence to support an essential element upon which it will bear the burden of proof at trial. *Id.*

Once the moving party meets its initial burden, the non-moving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' [and] designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting FED. R. CIV. P. 56(e)). The non-movant "may not rest upon the mere allegations or denials of the adverse party's pleading." FED. R. CIV. P. 56(e); *Valandingham v. Bojorquez*, 866 F.2d 1135, 1137 (9th Cir. 1989). However, any inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

**B.    Genuine Issues of Material Fact Preclude Summary Judgment**

The QST introduces ample evidence below to demonstrate that there are genuine issues of material fact. The Motion lists fifteen "uncontested facts" that Duncan believes to be "material to the resolution of this matter on summary judgment." Motion at 14. But most of these "facts" are hotly disputed, as shown below. Therefore, Duncan's Motion should be denied in its entirety.

**1.    Material Fact #1**

**"B&B told Duncan it was unwilling to participate in the litigation without his assistance. Ex A at ¶4. Specifically, B&B would require Duncan to: 1) handle most of the day-to-day communications with the numerous Direct Lenders, such as phone calls seeking status of the litigation or of particular loans; 2) front the bulk of the litigations costs, until recoveries from litigation were available to pay such costs; and 3) provide substantive law expertise regarding the servicing agreements, waterfall analysis, and master repurchase agreements. *Id.*"**

Material Fact #1 is disputed.

First, B&B partner Michael Collins has expressed to Cangelosi that when Duncan approached B&B about the possibility of accepting retention by the direct lenders, Duncan led B&B to believe that the direct lenders were insisting that Duncan serve as co-counsel with B&B and would not retain B&B unless Duncan was also co-counsel for the representation. Cangelosi Decl., ¶14. Thus, rather than being "unwilling to participate in the litigation without his assistance," the QST can establish that B&B in fact thought that including Duncan was a condition to it being retained by the direct lenders. *Id.*

Second, Collins has expressed to Cangelosi that if Duncan had not been involved as co-counsel, B&B would have charged a lower contingency fee percentage equal to the amounts payable to B&B under the existing Retention Agreement (i.e. 25%-35%). *Id.*

Third, Collins has expressed to Cangelosi that Duncan has failed to advance litigation expenses since 2009. *Id.*

Fourth,  aside from the testimony of Ms. Cangelosi,  a reported decision in  the California courts and  B&B's own website cast substantial doubt on the credibility of Duncan's assertion that

he was required by B&B to be hired to lend that firm  expertise it did not have. B&B was lead counsel in a ground-breaking agency termination case in California that preceded the 892 case by several years and established that a servicer (in that case, a hotel management company) could be terminated for any reason (or no reason) despite an agreement which provides that termination could only be for cause. *See Woolley v. Embassy Suites, Inc.*, 227 Cal. App. 3d 1520, 278 Cal. Rptr. 719 (Ct. App. 1991) (cited in the B&B brief in support of the motion to terminate in the '892 Case)(*see* 892 Doc. 1088 at 11) (Cangelosi Decl., ¶25 and Exhibit 1). A video portion of B&B's website also contains statements by Bill Brewer and B&B partner Jim Renard that:

> The way you build a firm that specializes in big stakes, bet-your-business litigation is first and foremost to recognize that it is a specialty. . . .There is always a topic that is in controversy.  There's always some set of facts or area of the law that people disagree over.  And they may with all their might and all their strength and everything they own.  You have to commit yourself to becoming the world's leading expert on the facts and the law that pertain to your client's case.  And honest to goodness, those are the building blocks against which we accept a case or reject it.  Are we interested in the subject matter? Do we have an intuition that our clients are on the right side of the issue?    And then does it fit our model? [Brewer]

> We love going back to basics and understanding what are the fundamental precepts and what's the logic of the law and, how understanding the logic of the law, would you be able to apply that to a specific fact situation.  That's the expertise that we bring to the table as commercial litigators.  [Renard]

> In practice areas, we have the leading case, we have the break-through case.  Once we have the practice development, we turn down the succession of cases that come afterward, merely because it is inconsistent with who we are and what we want to be.  [Brewer]

> What truly captures what this firm is all about is what I frequently tell recruits, tell my fellow partners and associates, and tell clients and potential clients: if I were in the other side, I would be scared to death of us.  [Renard]

*See* Cangelosi Decl, ¶26 (B&B 'Art of Advocacy' Video). Thus, the record contains ample evidence to raise a triable issue concerning "Material Fact #1" (that B&B required the retention of Duncan to "provide substantive law expertise regarding the servicing agreements, waterfall analysis, and master repurchase agreements" at issue in the case).

Finally, the record also contains admissions by Duncan and his company, Cross, which raise issues of material fact about the "communications" part of Duncan's Material Fact #1. In pleadings against Cangelosi, Newman, Kesler and others in this case (which were ultimately dismissed by this Court under FRCP 12(b) (6) for failing to state claims *as a matter of law*), Duncan alleged *as a matter of fact* that others were responsible for the DL communications." ECF No. 26. Thus, there is a triable issue of fact on this subject as well.

### 2.    Material Fact #2

**"B&B entered into Retention Agreements with over 1200 Direct Lenders, each using the form of agreement attached as Ex. A-3. Ex. A at ¶7."**

That the B&B DLs entered into Retention Agreements with B&B in the form attached to Duncan's declaration is not disputed. But the critical determination this Court must make in this case, and which cannot be resolved in the context of Duncan's pre-discovery summary judgment motion, is what exactly Duncan's status was vis-à-vis B&B and the direct lenders. He has made multiple contradictory statements concerning those issues. For example:

o  "I am co-counsel with Bickel & Brewer. We are jointly representing [the direct lenders] based on a contingency fee agreement." [*See* 892 Doc. 2053 ¶ 3].

o  "The DLs do not have a contingency fee agreement with Mr. Duncan." (ECF No. 84).

o  "Duncan has alleged, and continues to maintain, that he had an agreement with Bickel & Brewer-independent of Bickel & Brewer's agreement with DLs - under which he expected to be paid 50% of the contingency fees earned by Bickel & Brewer under its agreement with the DLs. That agreement is referenced in the [Retention Agreement], but is still a separate bundle of duties and obligations." (ECF No. 111).

o  "[T]he DLs had an attorney/client relationship with Duncan" (ECF No. 84)

o  "Duncan was not hired by the Direct Lenders and could not have misled them, as the B&B Agreement is between B&B and the Direct Lenders." (ECF No. 131).

o  "B&B, not Duncan or Cross, was the party with whom the DLs were contracting, and that B&B was hiring Duncan as special counsel." (ECF No. 84).

o  "The Direct Lenders are former clients of both Duncan and Cross." (ECF No. 131).

### 3.   Material Fact #3

**"B&B's pro hac vice application was approved by the Court, with the disclosure to the Court that Duncan would be part of the legal team and would share in the both the expenses and contingency fee, if any. *See* Transcript of March 16, 2009 hearing, Doc. 1008, the relevant portion of which (Pg. 112, Ln. 10 – Pg. 114, Ln. 23) is attached as Exhibit B."**

Material Fact #3 is disputed.

First, Duncan has judicially admitted that "[t]he DLs do not have a contingency fee agreement with Mr. Duncan." (ECF No. 84). Exactly what relationship with the direct lenders he *did* have must be developed through discovery, including depositions of Duncan and B&B lawyers.

Second, B&B partner Collins has expressed to Cangelosi that Duncan almost immediately failed to advance expenses as he was obligated to do under the Retention Agreement. Cangelosi Decl. In fact, Collins has expressed to Cangelosi that he wrote personal checks to the B&B firm to cover the expenses that Duncan did not or could not.  Cangelosi Decl., ¶14

Third, the Court indicated in the March 16th transcript that it would not approve a "grand referral" fee.  The attorney declarations submitted by the plaintiffs' counsel in the 892 Case show that Duncan provided, at best, only a quarter of the services, *yet is demanding half the fees*.   As was explained in the CRT's briefing in connection with the motions to dismiss, the law – like this Court indicated in its comments – does not allow for a disproportionate sharing of legal fees. *See* ECF No. 55.

### 4.   Material Fact #4

**"After the B&B Direct Lenders prevailed at trial, the B&B Direct Lenders filed a motion for attorneys' fees. Doc. 2051."**

The fact that a motion was filed is not disputed.

### 5.    Material Fact #5

**"The Court approved the award of attorneys' fees to the Direct Lenders, calculated under the lodestar approach, while acknowledging that Duncan and B&B were actually entitled to be compensated by the Direct Lenders according to the contingency fee agreement. Doc. 2350."**

Material Fact #5, as stated, is disputed.

First, the Court did not acknowledge that B&B and Duncan were "entitled" to be paid a contingency fee. The memorandum opinion and final judgment awarding attorney's fees holds:

> "[T]he Court cannot use plaintiffs' contingency fee agreement to increase or decrease what it concludes is a reasonable attorneys' fee under the lodestar approach. See Van Gerwen v. Guarantee Mut. Life Co., 214 F.3d 1041, 1048 (9th Cir. 2000) ("A district court may not rely on a contingency agreement to increase or decrease what it determines to be a reasonable attorney's fee."); Quesada v. Thomason, 850 F.2d 537, 543 (9th Cir. 1988) ("We therefore reject the claim that a contingent-fee agreement can justify lowering an otherwise reasonable lodestar fee."). **In other words, because the Court finds that its award of attorneys' fees to plaintiffs as a measure of compensatory damages is reasonable under the lodestar approach, the Court *need not and will not* undertake the arduous task of calculating the actual contingency fee that plaintiffs may ultimately owe to Bickel & Brewer and Mr. Duncan.** See Hasbrouck v. Texaco, Inc., 879 F.2d 632, 639 (9th Case 2:07-cv-00892-RCJ-GWF Document 23268 Filed 07/130/13 Cir. 1989) ("The presence of a fee agreement is simply one of many factors to be considered in the determination of a reasonable fee, and '[s]hould a fee agreement provide less than a reasonable fee ..., the defendant should nevertheless be required to pay the higher amount.'") (quoting Blanchard v. Bergeron, 489 U.S. 87 (1989)). Thus, the Court rejects defendants' contention that its attorneys' fees award to plaintiffs must be based on the contingency fee agreement with their counsel. [See 892 Case Docs. 2328 at 35/line 18 to 36/line 5 (bold and italics added)]."

The foregoing paragraph shows that Duncan's argument about this Court's "approval" of his contingent fees is a total fabrication. The Court approved Duncan's fees under a lode-star analysis, NOT under the contingent fee analysis Duncan claims. In fact, the Court's citation to the *Hasbrook* case suggests that, if anything, the Court "expected" that any contingent fee which might be payable to Duncan would be *less* than the Court was awarding for Duncan's work.

Second, Duncan has judicially admitted that "[t]he DLs do not have a contingency fee agreement with Mr. Duncan." (ECF No. 84). He has also admitted that he "was not hired by the Direct Lenders and could not have misled them, as the [Retention Agreement] is between B&B

and the Direct Lenders." (ECF No. 131).  The fact that Duncan has also asserted contrary positions in this same case – indeed, by this very Motion -- only shows why the Court cannot entry summary judgment as a matter of undisputed fact and law.

### 6.    Material Fact #6

**"No Direct Lender objected to Duncan's being paid for his services at the time the motion for attorneys' fees was made, nor at any subsequent time when Duncan was actually paid contingency fees as tranches of money came in until early 2013 when a few Direct Lenders tendered form objections without details as to why Duncan should not be paid. Ex. A at ¶14."**

Material Fact #6 is disputed.

First, B&B partner Michael Collins has expressed to Cangelosi that in December 2012 and January 2013, B&B became aware that certain B&B DLs objected to paying Duncan's legal fees. B&B therefore held $700,000 back from Duncan. Duncan then retained his own counsel. After Collins had a meeting with Cangelosi and Knoles in February 2013, counsel for  B&B wrote a letter to Duncan's counsel stating that B&B would pay over the funds to Duncan but suggesting that he segregate the money in his attorney trust account. But Duncan then cashed the check. See Cangelosi Decl., ¶ ¶ 19-21; *see also* ECF No. 58 (Knoles Declaration).

Second, the declaration of QST trustee Coulson affirms that he has been contacted by DLs objecting to the payment of fees to Duncan. ECF No. 56.

Third, 1,016 of the DLs of the DLs who are beneficiaries of the QST are also beneficiaries of the CRT. *See* ECF No. 57. Of those 1,016 DLs, 1,010 have authorized the CRT to represent their interests in objections to and complaints about paying Duncan fees. *Id.* Indeed, as Duncan's own motion to dismiss acknowledges, at least 40% of those 1,010 made affirmative "Assignments" of that power to the CRT under the procedure set forth in the Court's settlement order (AR Dkt. No. 1915) and the Liquidating Trust Agreement approved therein. *See* ECF No. 89 at 8).

Fourth, it is undisputed that the DLs were represented on multiple-client basis.  Objection by one client—let alone hundreds—about the fees he is seeking from a common fund from the plaintiffs is enough to make the QST ask for guidance from the Court.

Finally, this Court has already ruled in connection with the Motions To Dismiss AND in the Clarification Order that the QST has standing to seek a declaration about whether it can pay the money to Duncan. Duncan's recitation of the number of complaining DLs does not change this already-decided ruling.

### 7.    Material Fact #7

**"Before the QST was formed, when funds were recovered for the Direct Lenders, Cangelosi, Daniel Newman and Rodger Stubbs calculated the amount of the contingency fees due to B&B and/or Duncan and submitted declarations to the Court. In the case of property or loan dispositions, checks to B&B, which included Duncan's share of the contingency fee, were cut from escrow pursuant to Cangelosi's calculations, or if funds were received by B&B's trust account, checks to Duncan were cut by B&B. Id. at ¶15."**

Material Fact 7 is disputed, as stated.

The QST does not dispute that, in general, there were times when calculations were made prior to the formation of the QST in which Duncan received contingent fees. But Duncan's motion papers do not provide any of the particulars, so it is impossible to specifically admit or deny Duncan's assertion of "fact." The QST also notes that the record shows that there were times when Duncan was advised to set aside cash he was given by B&B until client objections were resolved and he refused to do so and took the money anyway. *See* ECF No.  58 (Knoles Decl.). The QST also avers that it is undisputed that the QST received the funds placed in the registry of the Court and the Court has ruled that the QST has standing to seek a declaration about whether those funds are properly payable to Duncan.

### 8.    Material Fact #8

**"After the settlement with Silar, Cangelosi's group did the calculations, and the ARC Trustee cut one check to B&B on behalf of all Direct Lender clients. Cangelosi hereafter directed what checks should be written to the B&B Direct Lenders out of the B&B Trust Account. *Id.* at ¶16."**

Material Fact #8 is disputed, as stated.

The QST responds to this purported "material fact" as it did with respect "Material Fact #7." The QST does not dispute that B&B received the initial payments from the Silar/Asset Resolution settlement and that Cangelosi participated in a process which ultimately led to B&B's decision to make certain distributions of those funds from its trust account. The QST also notes that Duncan does not allege whether or not there were any objections made by any DLs at the time covered by this asserted "fact." There are hundreds of objectors to paying Duncan the funds deposited with the Court today. The record also shows that B&B paid other money to Duncan over the objections of certain informed DLs, that B&B apparently told Duncan to set the money aside until client objections were resolved, and Duncan refused to do so and took the money anyway. *See* ECF No. 58 (Knoles Dec.). There is thus a triable issue as to the import of "Material Fact #8" on the issues in this case.

### 9.    Material Fact #9

**"Duncan received the following payments due to him under the Retention Agreement at the following times: [Chart excluded] Id. at ¶17."**

Disputed, as stated. The QST does not dispute that Duncan received fees from various loan resolutions. The QST notes that Duncan does not state how much he received from such loan resolutions, a fact which is essential to determining several issues in the case (including for example the reasonableness or excessiveness of his fees). This omission may have been a purposeful effort to avoid alerting this Court that Duncan has been paid legal fees in an amount more than 5x what he sought under the 'lodestar' calculation.

### 10.    Material Fact #10

**"The QST recently received $4.5 million in proceeds from the Direct Lenders, which proceeds are subject to the contingency fees due B&B and Duncan."**

It is undisputed that the QST was the recipient of a $4.5 million distribution from the Asset Resolution bankruptcy estate, which in turn resulted from the Silar/Asset Resolution settlement approved in the Agreed Order (AR Dkt. 1915).  But the rest of Material Fact #10 is disputed, as stated. First, Duncan has judicially admitted that "[t]he DLs do not have a contingency fee agreement with Mr. Duncan." (ECF No. 84) Second, whether the proceeds are "subject to the contingency fee due . . . Duncan" is the ultimate issue in the case and therefore not merely a "fact."

### 11.    Material Fact #11

**"The QST admits that Duncan has not been paid his share of the contingency fees on the $4.5 million, calculated according to the Retention Agreement. Doc. 1 in this adversary proceeding at ¶¶2-7."**

It is undisputed that the QST was the recipient of a $4.5 million distribution from the Asset Resolution bankruptcy estate, which in turn resulted from the Silar/Asset Resolution settlement approved in the Agreed Order (AR Dkt. 1915).  It is also undisputed that the QST was advised in the February 2014 letter from B&B that half of the contingent fee calculated under the Retention Agreement should not be paid that should not be paid to B&B.  It is also undisputed that the money was then deposited by the QST with this Court in this case. The rest of Material Fact #11 is disputed, as stated.   First, Duncan has judicially admitted that "[t]he DLs do not have a contingency fee agreement with Mr. Duncan." (ECF No. 84) Second, whether Duncan has a right to receive a "share" of the contingency fee is the ultimate issue in the case and therefore not merely a "fact."

### 12.    Material Fact #12

**"The Retention Agreements contains [an] arbitration clause"**

Disputed, as stated. There is no dispute that the Retention Agreement contains the text reproduced on pages 16-17 of the Motion. But Duncan has waived this term because he has judicially admitted that this Court has jurisdiction with respect to the rights of the parties under the Retention Agreement." (*See* ECF No. 61) ("Pursuant to 28 USC §2201 of the Declaratory Judgment Act, this court is empowered to issue a declaratory judgment stating that the rights of the CRT under the POC Agreement are inapplicable and void as to the rights of Duncan and B&B under the B&B retention agreement with the B&B Settling DLs.").   Also, this action is a declaratory action by the QST, which is not bound by the arbitration clause.

### 13.    Material Fact #13

**"To date, no Direct Lender signatory to any Retention Agreement has commenced an arbitration or any other legal proceeding against Duncan relating to his attorney's fees or his services. Ex. A at ¶20. Similarly, no Direct Lender signatory to any agreement with Cross FLS, LLC has commenced any kind of legal proceeding against Cross FLS, LLC concerning its fees or services. *Id.*"**

Disputed, as stated.

First, a declarant's statements based on "information and belief" or similar wording are not admissible in the summary judgment context. *Sehll Rocky Mountain Prod., LLC v. Ultra Res., Inc.*, 415 F.3d 1158, 1169 n.6 (10th Cir. 2005). Rule 56(c)(4) provides that a only formal affidavit or a written unsworn declaration that complies with 28 U.S.C. § 1746 can be used to support or oppose a motion for summary judgment. Duncan has failed to offer competent summary judgment evidence to support Material Fact #13 to the extent he relies on the "information and belief" assertion in paragraph 20 of his declaration submitted in support of the Motion.

Second, the record shows, and Duncan is well aware, that the CRT filed a cross-claim against him in this litigation as the authorized representative of 1,010 DLs. (ECF No. 4)

Third, Duncan has judicially admitted many times in this proceeding that over 40% of the CRT's beneficiaries (who are B&B DLs) have affirmatively voted in favor of empowering the CRT to pursue their claims against Duncan concerning his fees and "services." (*See, e.g.*, ECF No. 89 at 8); *see also* ECF No. 61 ¶ 64 ("After the Complaint was filed, Cangelosi, Knoles, Newman and others used the CRT Trustee's complaint as a tool to demonstrate legitimacy to their allegations against Duncan, and then proceeded to send ballot communications to the B&B DLs to opt into the pending action against Duncan. Any prudent DLs that were to take as true the allegations contained in the CRT Complaint would reasonably elect to opt in.").

### 14.    Material Fact #14

**"Duncan has never heard anyone from B&B voice any objection to his being paid share of the contingency fees, but the QST has withheld Duncan's share of the most recent tranche of money. *Id.* at ¶21."**

It is undisputed that the QST has deposited $997,106.11 of funds with the Court. The rest of Material Fact #14 is disputed.

First, Duncan and B&UB lawyers have yet to be deposed, so the QST has not had an opportunity to determine the nature and extent of what he has "heard" from "anyone at B&B."

Second, the "fact" that Duncan "has never heard" B&B object to Duncan being paid under the Retention Agreement does not establish that B&B has not objected nor that Duncan is entitled to the Interplead Funds even if B&B has not objected.

Third, B&B partner Michael Collins has expressed to Cangelosi that in December 2012 and January 2013, B&B became aware that certain B&B DLs objected to paying Duncan's legal fees. B&B therefore held $700,000 back from Duncan. Duncan then retained his own counsel. After Collins had a meeting with Cangelosi and Knoles in February 2013, counsel for B&B wrote a letter to Duncan's counsel stating that B&B would pay over the funds to Duncan but suggesting

that he segregate the money in his attorney trust account. But Duncan then cashed the check." *See* Cangelosi Decl., ¶ ¶ 19-21; *see also* ECF No. 58 (Knoles Decl.).

Fourth, Collins has expressed B&B's willingness to compromise on or forgo future fees that may be owed by the B&B DLs pursuant to the Settlement Order as an accommodation to the direct lenders and in an effort to ensure that the fees received by B&B from the B&B DLs are reasonable. But B&B has informed Cangelosi that they been unable to commence such an agreement with the B&B DLs or Duncan due to threats by Duncan through Rodger Stubbs that he/they will sue B&B for "interfering" with Duncan's "right" to receive fees if B&B undertakes such a course of action. *See* Cangelosi Decl., ¶14.

Finally, Collins has expressed to Cangelosi that he has had several discussion with Duncan and Stubbs, separately and together, in which they disagreed about legal fees charged to the B&B DLs. For example, one of the disagreements that Collins is expected to testify about involved whether the B&B DLs should pay 1.15% of the unpaid principal balance of the loans as a contingent fee for "savings" relating to certain charges by the Court-appointed receiver. B&B was willing to waive those fees and Duncan was not. B&B "waived" such fees as an accommodation to the direct lenders and in an effort to ensure that the overall fees being charged to the clients were reasonable and did not further erode the B&B DLs small loan recoveries in favor of legal fees. *See* Cangelosi Decl., ¶14.

## 15.    Material Fact #15

**"Duncan is informed and believes that neither the QST, nor the Direct Lenders, nor the Claims Recovery Trust have expressed any objection to B&B being paid under the Retention Agreement, nor have any expressed that B&B is not contractually entitled to be paid the full contingency fee under the Retention Agreement. *Id.* at ¶22."**

Material Fact #15 is disputed as stated.

First, a declarant's statements based on "information and belief" are not admissible in the summary judgment context. *Sehll Rocky Mountain Prod., LLC v. Ultra Res., Inc.*, 415 F.3d 1158,

1169 n.6 (10th Cir. 2005). Rule 56(c)(4) provides that a only formal affidavit or a written unsworn declaration that complies with 28 U.S.C. § 1746 can be used to support or oppose a motion for summary judgment. Thus, Duncan has failed to offer competent summary judgment evidence to support Material Fact #15 to the extent he relies on paragraph 22 of his declaration.

Second, the QST has been informed in writing that B&B does not consider itself entitled to 100% of the contingency fee under the Retention Agreement. In a February 14, 2014 letter to QST trustee Michael Coulson, B&B partner Michael Collins acknowledged that "the fees payable to Bickel & Brewer and Duncan are properly being allocated separately under the [Retention Agreement]." *See* Rasmussen Decl., Ex. 1.

Third, Collins has expressed the same to Cangelosi, stating that the fees to be paid to Duncan by the B&B DLs were and are independent from the fees to be paid to B&B, in keeping with: (a) Duncan's role as co-counsel; (b) what Collins understood to be the Court's admonitions at the March 16, 2009 hearing when it allowed Duncan to appear as co-counsel in the 892 Case; and (c) what Collins understands to be the requirements of Texas law applicable to "sharing" of fees by lawyers from different firms pursuant to Texas Disciplinary Rule of Professional Conduct 1.04(f). *See* Cangelosi Decl., ¶14.

**VII.**

**DUNCAN'S MOTION DOES NOT ESTABLISH THAT HE IS ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW**

If the Court does not deny the Motion as premature or because these are numerous material facts in dispute, it should still deny the Motion because Duncan's legal arguments do not establish the right to summary judgment.

**A.    Breach Of Contract**

Duncan alleges that the "facts stated above establish a prima facie case for breach of contract." Motion at 18. This argument is unavailing.

First, to the extent that Duncan seeks a declaration from this Court that the QST and/or the direct lenders breached the Retention Agreement by not paying Duncan the Interplead Funds, the request is inappropriate in the declaratory judgment context. The QST seeks a determination by this Court of the parties' rights under the Retention Agreement so that it or its direct lender beneficiaries do *not* commit breach of contract or any other wrong. That is the purpose of declaratory judgment actions; they are a means to resolve such uncertainty. *See* 28 U.S.C. § 2201(a) (In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."). If Duncan wants to assert a breach of contract claim, he should plead it, which he has not done. (*See* ECF No. 137, Duncan's Answer).

Second, the multitude of facts set out in Section V above create genuine issues of material fact concerning Duncan's "entitlement" to be paid the Interplead Funds or any other money by the direct lenders. Duncan has, through statements made in this litigation such as "Duncan was not hired by the Direct Lenders and could not have misled them, as the [Retention Agreement] is between B&B and the Direct Lenders," (ECF No. 131), and "[t]he DLs do not have a contingency fee agreement with Mr. Duncan," (ECF No. 84), put at issue whether he has violated this Court's admonition (and Texas or Nevada law concerning lawyers) that he could not receive a "grand gift of a 50-percent referral fee" and could only be paid for "his fair share of the litigation effort" as a duly-admitted lawyer for the case. [*See* March 16, 2009 Transcript at 113/lines 12-19]. Thus, Duncan may not prevail on a claim that he has not pled, that is wholly inappropriate in the current procedural context of this case, and that is defeated by his own statements made in this litigation.

## B.  <u>Pattern of Payment</u>

Duncan argues that "he has consistently been paid under the Retention Agreement." Motion at 18.  To what end this statement is made is not clear. Duncan has judicially admitted that

he has "ethical obligations to the Direct Lenders." (*See* ECF No. 84 at 8). Clients have a right to object to their lawyer being paid fees. Under Texas law, a lawyer who breaches his fiduciary duties to his clients forfeits the right to recover legal fees and may also be required to disgorge fees already received. *See Burrow v. Arce*, 997 S.W.2d 220, 240 (Tex. 1999). Also, Texas law allows a court to refuse to award a lawyer unconscionable fees. *Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 562 (Tex. 2006) (citing TEX. Bus. & COM. CODE ANN. § 2.302 (Vernon 1994). Just because Duncan has accepted payments in the past not does not establish that it was proper for him to do so or that he is entitled to the Interplead Funds or future fees now.

C.    **Standing**

Duncan argues that "[n]either the QST nor the Direct Lenders have standing to determine whether B&B should pay Duncan" because "[w]hether or not a Direct Lender objects to Duncan being paid, the Direct Lenders are obligated **to pay B&B** the full amount of its contingency fee." Motion at 19 (bold added).

First, B&B has disclaimed any interest in the money placed with this Court, per their February 2014 letter. That letter acknowledged that "the fees payable to Bickel & Brewer and Duncan are properly being allocated separately. . . ." *See* Rasmussen Decl., Ex. 1. Collins has in fact expressed the same to Cangelosi, stating that the fees to be paid to Duncan by the B&B DLs were and are independent from the fees to be paid to B&B, in keeping with: (a) Duncan's role as co-counsel; (b) what Collins understood to be the Court's admonitions at the March 16, 2009 hearing when it allowed Duncan to appear as co-counsel in the 892 Case; and (c) what Collins understands to be the requirements of  Texas law applicable to "sharing" of fees by lawyers from different firms pursuant to Texas Disciplinary Rule of Professional Conduct 1.04(f). *See* Cangelosi Decl., ¶ 14. So Duncan is simply wrong.

Second, this Court has already ruled in connection with the motions to dismiss and in the Clarification Order that the QST has standing to seek a declaration of what to do with the money. Also, the Court ruled in the Clarification Order that the QST "may amend its Complaint to so allege [that DL clients have appointed the CRT to represent their objections], in which case there will presumably be interpleader jurisdiction due to Duncan's and CRT's rival claims to the common funds." (ECF No. 143 at 3-74). The QST intends to file such an amendment shortly.

Third, as noted in section VII 2 above, the law clearly empowers a client to object to the receipt of fees by his counsel and then requires the lawyer to obtain a resolution of that objection before taking the fees. Second, the facts Duncan presents in the Motion to support his standing argument have been contradicted by this Opposition and its supporting declarations.

Finally, Collins has expressed B&B's willingness to compromise on or forgo future fees that may be owed by the B&B DLs pursuant to the Settlement Order (except for work on the ongoing Compass litigation) as an accommodation to the direct lenders and in an effort to ensure that the fees received by B&B from the B&B DLs are reasonable. But B&B has been unable to commence such an agreement with the B&B DLs or Duncan due to threats by Duncan through Rodger Stubbs that he/they will sue B&B for "interfering" with Duncan's "right" to receive fees if B&B undertakes such a course of action. *See* Cangelosi Decl., ¶14.

These facts belie the argument that the QST does not have standing in this declaratory judgment action because 'B&B gets the money no matter what.'

### D.    Valuableness of Duncan's Services

Duncan argues that "[t]he Court has already recognized that Duncan and B&B have provided services and that he and B&B are entitled to recover contingency fees under the Retention Agreement." Motion at 20. The QST has addressed the "entitlement" argument in its

response to "Material Fact #5" above. Duncan simply misstates what the Court did—and did not—rule.

**E.      No Basis to Withhold All Sums**

Duncan argues that "the QST has no basis to withhold 100%" of the Interplead Funds." Motion at 21.  But as this Court has acknowledged, the QST is "seeking a declaration on behalf of the beneficiaries that Duncan is entitled to *none* of the Funds." (ECF No. 133 at 5) (emphasis added). The QST should not be made to expose itself to potential liability by picking and choosing which of its beneficiaries' money it should disburse. This is especially the case in light of the fact that the CRT, as this Court has recognized, may become a party to this case again and assert not only that Duncan should not be paid the Interplead Funds but also that he should disgorge fees paid to him already and/or be liable for damages he and his servicer entity Cross caused the direct lenders.

**VIII.**

**CONCLUSION**

For the reasons set forth above, Duncan's motion for summary judgment should be denied in its entirety or, in the alternative, the motion should be continued so as to permit discovery pursuant to Rule 56(d).  The Court should also grant the QST such other relief to which it proves entitled.

Dated:  February 4, 2015                    **LAW OFFICE OF LISA RASMUSSEN**

                                            By:    */s/ Lisa Rasmussen*
                                                   Lisa A. Rasmussen, Esq.

                                            *Attorneys for Plaintiff QST*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I am a person competent to serve papers and that on this 4th day of February, 2015, I served a copy of the following items on all counsel in this matter, participating in CM/ECF, as required by local rule:

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT FILED BY DUNCAN

DECLARATION OF DONNA CANGELOSI IN SUPPORT OF OPPOSITION

DECLARATION OF LISA RASMUSSEN IN SUPPORT OF OPPOSITION

DECLARATION OF FRANCIS MAJORIE IN SUPPORT OF OPPOSITION

/S/ Lisa A. Rasmussen

_____

LISA A. RASMUSSEN, ESQ.