Timothy S. Cory, Esq.
Nevada Bar No. 001972
**TIMOTHY S. CORY & ASSOCIATES**
8831 West Sahara Avenue
Las Vegas, Nevada 89117
Telephone: (702) 388-1996
tim.cory@corylaw.us

Michael D. Rawlins, Esq.
Nevada Bar No. 005467
**DURHAM JONES & PINEGAR**
10785 W. Twain Ave., Suite 200
Las Vegas, Nevada 89135
Telephone: (702) 870-6060
mrawlins@djplaw.com

*Attorneys for McAlan Duncan*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ASSET RESOLUTION, LLC<br><br>Debtor, | Case No. BK-S-09-32824-RCJ<br>(Lead Case)<br><br>Chapter 7 |
| THE B&B DL SETTLEMENT TRUST,<br><br>Plaintiff,<br>vs.<br><br>MCALAN DUNCAN.<br><br>Defendant. | Jointly Administered with Case Nos:<br>BK-S-09-32831-RCJ; BK-S-09-32839-RCJ;<br>BK-S-09-32843-RCJ; BK-S-09-32844-RCJ;<br>BK-S-09-32846-RCJ; BK-S-09-32849-RCJ;<br>BK-S-09-32851-RCJ; BK-S-09-32853-RCJ;<br>BK-S-09-32868-RCJ; BK-S-09-32873-RCJ;<br>BK-S-09-32875-RCJ; BK-S-09-32878-RCJ;<br>BK-S-09-32880-RCJ; BK-S-09-32882-RCJ<br><br>Adversary No. 14-01032-RCJ<br><br>**REPLY POINTS AND AUTHORITIES<br>IN SUPPORT OF MOTION FOR<br>SUMMARY JUDGMENT** |

### A.  <u>Introduction</u>

In his motion for summary judgment, Duncan has proven and the QST has not contested that:

- 1 -

- Duncan was an integral part of the litigation team that scored a massive victory for the Direct Lenders.
- His services were praised by the Court in response to the Direct Lenders' motion for attorneys' fees.
- The effective contingency fee, given the way the contingency fees was calculated as a percentage of recovery above a baseline, is a small percentage of the assets recovered.
- No direct lender has filed a claim against Duncan or commenced an arbitration against him under the Bickel & Brewer ("B&B") Engagement Agreement.
- Donna Cangelosi, the ringleader of the Direct Lenders, and the Advisory Committee Chair for the QST, has praised not only the favorable contingency arrangement she negotiated with B&B, but also the results B&B and Duncan obtained for the Direct Lenders.
- No one has objected to B&B's services or disputed that B&B is entitled to be paid the full amount of its contingency fee.  No one has denied that Duncan is an express third-party beneficiary of the B&B Engagement Agreement, who is permitted to collect half of B&B's contingency fee.
- No one has alleged that B&B has told the QST not to pay Duncan his share.  It is undisputed that B&B has not objected to Duncan receiving payment.
- Duncan has been paid consistently his 50% share of the contingency fees—a total of 19 payments over a four year period, without objection from the Direct Lenders.

This raises important questions:  "What has changed?  Why has the QST, who has heretofore claimed to be a disinterested party, stopped paying Duncan four years after his efforts secured a large victory for the Direct Lenders?"  The *Opposition to Motion for Summary Judgment* (the "Opposition Brief") provides no satisfactory answers, and fails to raise issues of material fact.

1  The Court undoubtedly has noticed the amazing role reversal the QST makes in its Opposition

2  Brief.  Last year, the QST commenced this action as a supposed innocent bystander seeking

3  guidance from the Court as to who is entitled to the $997,106.11 that would normally be paid to

4  Duncan as his share of the contingency fees.  The Court will recall that Duncan and Cross

5  objected to the interpleader as a collusory move by the QST and the CRT (which filed its cross-

6  claim the same day).  The QST objected to that characterization, insisting it was a disinterested

7  stakeholder.

8         The QST, led by the ever changing Donna Cangelosi (who is also a CRT Committee

9  Member), now argues the Duncan should not be paid <u>anything</u> for his services.  This is not only a

10  new position for the QST, but also for Cangelosi, who has said the opposite, as will be shown

11  below.

12         The QST seems to believe one can raise a genuine issue of material fact for purposes of

13  summary judgment simply by changing one's position, and raising of series of *"what ifs."*  What

14  if Duncan wasn't really a necessary part of the litigation team?  What if Duncan didn't pay all

15  the expenses he told B&B he would pay?  What if B&B would have given a lower contingency

16  fee to the Direct Lenders if Duncan had not been involved?  These questions, according to the

17  QST, justify not paying Duncan.

18         **B.  <u>The QST lacks Standing to Assert Claims Against Duncan.</u>**

19         Before addressing, from the summary judgment standpoint, the fallacy of the QST's

20  position, we will address whether the QST has standing to assert the supposed claims of the

22  Direct Lenders as a defense to paying Duncan. It does not.

23         On October 15, 2014, Duncan and Cross FLS, LLC ("Cross") filed an *Objection to the*

24  *CRT Acting as the Real Party in Interest and Motion for Substitution, Joinder, or Ratification of*

25  *the Real Parties in Interest* (the "Real Party in Interest Motion").  Two days later, the Court

26  issued its order dismissing the CRT from the case, and therefore, the Court has never ruled on

27  the *Real Party in Interest Motion*.  With respect to the question of standing, the points and

28  authorities in that motion, a copy of which is attached as Exhibit "A," are just as applicable to the

QST (in its new role) as they were the CRT. Duncan incorporates those points and authorities herein, and will summarize them briefly.

### Summary of Real Party in Interest Motion

1.    The CRT has represented to this Court that the interests of certain Direct Lenders are being prosecuted against Duncan and Cross by virtue of an "Assignment" or appointment of the CRT in a "Representative Capacity."

2.    The Direct Lenders are the "real parties in interest" for the claims raised by the CRT, which has refused to identify the Direct Lenders it purports to represent.

3.    Duncan and Cross are fundamentally entitled: 1) to avail themselves of evidence and defenses they may have against the real parties in interest; and 2) to assure finality of the judgment, including protection against future suits brought by participating Direct Lenders. The current framework of this case does not permit these fundamental rights.

4.    Under Fed. R. Civ. P. 17, Duncan and Cross may object to the CRT claiming to assert an interest in the action. If, after a reasonable time, the real parties in interest have not been joined, substituted in the action, or have not ratified in writing that they are bound by the action, the court may dismiss the action for failure to prosecute in the name of the real party in interest.

5.    The trustee of the CRT may not claim standing under Fed.R.Civ.P. 17(a)(1)(e) by virtue of being a trustee. The Supreme Court and Ninth Circuit have forbidden bankruptcy trustees from asserting claims that do not belong to the estate. The CRT has admitted that the claims it asserted would not benefit the estate but only certain assigning creditors.

6.    Outside of the bankruptcy context, trustees often have authority to sue on behalf of the real parties in interest—the beneficiaries of a trust. See Fed.R.Civ.P. 17(a)(1)(e). But a bankruptcy Trustee does not have standing to sue third parties on behalf of the estate's creditors, but may assert only claims owned by the bankruptcy

- 4 -

estate. This principle is derived from the Supreme Court's decision in *Caplin[1]*, where the Court concluded that a reorganization trustee had no standing under the Bankruptcy Act to assert, on behalf of the holders of the debtor's debentures, claims of misconduct against a third party.

7.      The holding of *Caplin* remains valid under the current version of the Bankruptcy Code, and is equally applicable to both reorganization and liquidation trustees. The Ninth Circuit adopted *Caplin* in *Williams v. Cal. 1st Bank*, 859 F.2d 664, 666 (1988).  The *Williams* Court considered a defendant bank's motion to dismiss the bankruptcy trustee's lawsuit asserting federal securities laws violations on behalf of creditors who had been defrauded in a Ponzi scheme. In response to the bank's assertion that the trustee did not have standing to bring such a suit, the trustee obtained an assignment of the claim from some of the investors. However, despite the assignment, the Court concluded that, under the Supreme Court's decision in *Caplin*, the trustee did not have standing to pursue the claim against the bank and the case should be dismissed.

8.      The *Williams* Court held that the third party investors, similar to the Direct Lenders in this case, were the real parties in interest, and the case should be dismissed:

> [T]he assignments notwithstanding, the investors plainly remain the real parties in interest in these actions. The Trustee and the estate will recoup only administrative costs from a favorable judgment; the investor-assignors receive the bulk of any recovery. In reality, then, the creditors have assigned their claims only for purposes of bringing suit. As a result, the Trustee, as in *Caplin*, is attempting to "collect money not owed to the estate." The fact that a Chapter 7 is involved rather than a reorganization does not suggest a different result[.][2]

9.      The *Williams* analysis applies to this case. As in *Williams*, any recovery of funds from Duncan and Cross will not go to the ARC Estate for pro rata distribution to

---

[1] *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 428- 434, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972); *Williams v. Cal. 1st Bank*, 859 F.2d 664, 666 (9th Cir. 1988); *Smith v. Arthur Andersen LLP*, 421 F.3d 989 (9th Cir.2005); *Hoskins v. Citigroup, Inc. (In re Viola)*, 469 B.R. 1 (B.A.P. 9th Cir. 2012). *Schnelling v. Thomas (In re Agribiotech, Inc.)* 319 B.R. 216 (D. Nev. 2004).

[2] *Williams*, 859 F.2d  at 666-67.

creditors, but instead, will be distributed to the real parties in interest, albeit a sub-class of the real parties in interest, the Direct Lenders who "assigned" their claims to the CRT. Also, as in *Williams*, the ARC Bankruptcy Estate has no independent claim against Duncan or Cross. The ARC Estate has no relationship with and cannot bring any claims against Duncan or Cross for the allegations in the CRT Cross-Complaint.

10.      Federal Rule of Civil Procedure 17 provides, "[a]n action must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a)(1). A real party interest is a person "whom the relevant substantive law grants a cause of action." The purpose of Rule 17(a) "is to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata." If a valid assignment is made for the purpose of collection, both the assignor and the assignee are considered real parties in interest for purposes of Rule 17.

11.      Without joinder or substitution of the Direct Lenders as parties, the Defendants face a significant risk of prejudice. Direct Lenders who did not affirmatively opt in, or possible, even those who did, might claim they are not bound by the litigation because they were not parties.

12.      Fed. R. Civ. P. 19, along with Fed. R. Civ. P. 17, requires joinder of persons with an interest in the litigation whose absence would "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest."

13.      Joinder or Substitution are the preferable means for correcting CRT's failure to bring this action in the name of the real parties in interest. Ratification, as an alternative to substitution or joinder, is appropriate only "to avoid forfeiture and injustice

1  when an understandable mistake has been made in selecting the party in whose name the

2  action should be brought."[3]

3          14.      Ratification by the real party in interest is authorized by Rule 17(a).

4  Ratification assures that the interested party is bound by the outcome of the suit, and that

5  it is subject to any orders the court may make concerning discovery or attorney fees.

6  Ratification assures that each party not only reaps the benefit but bears the burden of

7  claims litigated on its behalf.

8          If the QST now intends to assert the rights of the Direct Lenders as a basis for depriving

9  Duncan of the fees and costs he has earned, the QST lacks standing to do so for the same reasons

10  the CRT lacked standing.  Like the CRT before its dismissal from this case, the QST is not acting

11  for the benefit of the ARC bankruptcy estate, but rather is seeking to benefit some creditors—a

12  subset of Direct Lenders.  Similarly, to the extent the QST is asserting that malpractice, fraud, or

13  breach of fiduciary on Duncan's part excuses the Direct Lenders from paying Duncan's fees,

14  such claims cannot be asserted by the QST because they are simply not assignable.  This was

15  briefed thoroughly earlier in the case.  *See* Doc 96, pp. 6-8.

16          There are two more reasons the QST lacks standing to assert the arguments made in the

17  Opposition Brief.  First, many of the arguments made by the QST for not paying Duncan assume

18  the QST stands in the shoes of B&B.  For example, the QST argues, without competent

19  evidence, that Duncan was obligated to front certain costs of the litigation and that, owing to

20  Duncan's alleged failure to do so, B&B had to front them.  Duncan denies this, but it is also

22  irrelevant.  The QST does not argue that the Direct Lenders had to front them or were injured in

23  any way as a result of Duncan's alleged failure.   The QST also raises questions about the

24  division of labor between Duncan and Bickel & Brewer, as though merely asking questions

25  raises an issue of material fact whether Duncan should be paid.  It does not.

26

27

28  [3] 6A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 1555 (2006);
see also Fed. R. Civ. P. 17 Advisory Committee's note (1996) ("Modern decisions are inclined to be lenient when an
honest mistake has been made in choosing the party in whose name the action is to be filed.")

The contractual arrangement between attorneys working together is a matter between those attorneys. *Silverthorne v. Mosley*, 929 S.W.2d 680 (Tex. App. 1996) ("Where an attorney engages an associate counsel, the assistant counsel's compensation **is purely a question of contract between the attorneys.**") (quoting C.J.S. Attorney & Client § 148, P. 204) (emphasis in original). Bickel & Brewer has never complained to Duncan about the division of labor. But if there were a dispute between B&B and Duncan over that matter, the Direct Lenders are not part of it. Their fee agreement was with B&B. They owe B&B the full contingency fee agreed to between them and B&B, and they have not paid it. If B&B stated the QST could pay Duncan's allocation of that directly to Duncan, it still must be paid. The Direct Lenders did not inherit any unasserted claims B&B might theoretically assert against Duncan.

Finally, the QST lacks standing to assert the alleged claims of the Direct Lenders for a more fundamental reason. It is is simply not the QST's role to represent the Direct Lenders with respect to any complaints they might have against Duncan. The purpose of the QST was not to give the QST authority to assert claims on behalf of the Direct Lenders, but to maximize the value of the settlement through obtaining **favorable tax treatment**, and to handle administrative tasks, such as cutting checks to the appropriate parties. The Direct Lenders' October 19, 2012 *Ex Parte Motion for Entry of Order Approving Creation of Qualified Settlement Fund* (Doc 1951 in Case 09-32824-rcj) ("Motion to Create the QST") explained the purpose of the purpose of the QST.

> On September 6, 2012, the Court entered is Agreed Order Regarding Settlement and Related Relief (the "Settlement Order"). *See* Docket No. 1915. Pursuant to that Settlement Order, certain funds and property interests are to be transferred to the settling Direct Lenders represented by Bickel & Brewer (the "B&B DL Settling Clients"). ***To facilitate the most beneficial tax treatment of those funds and property interests to be transferred to the B&B DL Settling Clients pursuant to the Settlement Order, the Internal Revenue Service provides for the creation of a "qualified settlement fund" that must be approved by an order of the Court. See 26 U.S.C. § 468B; Treas. Reg. 1.468B-1. Thus, this motion seeks the Court's entry of the attached proposed order approving the creation of such a qualified settlement fund.***
>
> . . .

*The entry of that order is required for the transfer of the funds and property interests to the B&B DL Settling Clients pursuant to the Settlement Order, and the most beneficial tax treatment of that transfer.[4]*

Consistent with the basis asserted by the Direct Lenders in the Motion to Create the QST, in an April 1, 2013 email to the Direct Lenders, Daniel Newman, a QST Trust Advisory Committee member, represented the following about the purpose of the QST:

> In addition to approving the Settlement, Judge Jones also approved the formation of a Qualified Settlement Trust (QST) so the B&B DLs could receive and manage the illiquid equity interests of the ARC estate in the most tax advantageous manner for the B&B DLs. The intention of the QST is to realize as much value for the B&B DLs from those illiquid ARC estate assets as possible, in the following two ways:
>
> • Without the QST, B&B DLs could be subject to tax liability equal to the book value of ARC's illiquid direct lender interests, irrespective of whether a lower value (if any) may be ultimately recovered on those assets. The QST effectively acts as a buffer to accept those assets at book value but only pass to the B&B DLs the tax liability for those assets at the actual value recovered and distributed.
>
> • The QST will provide oversight and direction to the ARC estate to minimize expenses and maximize distributions to the B&B DLs. Specifically, the QST will: (i) take appropriate measures to ensure interim cash distributions from the ARC estate, as contemplated by the Settlement; (ii) assist in maximizing the value of the ARC estate's illiquid assets for the benefit of, and recovery by, the B&B DLs; and (iii) distribute such assets to the B&B DLs in accordance with the 'Net Distribution Schedule,' as further discussed below.

A copy of Daniel Newman's April 1, 2013 email is attached as Exhibit "B-1."

Nothing in the motion seeking the QST nor the QST's communications suggested the QST was organized to pursue claims of Direct Lenders. Accordingly, the Court granted the motion to create the QST (*See* Order, Docket 1952) noting:

> Accordingly, the B&B DL Settling Clients hereby seek the Court's immediate entry of the attached proposed order approving the creation of a qualified settlement fund. The entry of that order is required for the transfer of the funds and property interests to the B&B DL Settling Clients pursuant to the Settlement Order, and *the most beneficial tax treatment of that transfer.*

---

[4] Unless otherwise stated, all emphasis in cites and quotations is added.

No court order grants the QST the right to challenge the payments owed to attorneys.  In fact, the Court has already indicated that Direct Lenders who wish to challenge Duncan's receipt of fees would need to join.  The Court's October 17, 2014 Order (Doc 133 at fn. 1) stated,

> Apart from Duncan, Plaintiff names only Cross and CRT as Defendants. But Plaintiff makes no plausible allegations that Cross or CRT has made or might make any claim to the funds at issue adverse to Duncan's claims, and Plaintiff has not even identified, much less joined, the supposed Direct Lenders who (allegedly, based on what appears to be hearsay, though the allegations are not even that clear) object to the disbursement of fees to Duncan.

As it stands, the QST is now incurring legal expenses to assert claims, allegedly on behalf of Direct Lenders, that many of the Direct Lenders do not want to be asserted.  *See* Exhibit "C," email from Janet Chubb objecting to use of Direct Lender's funds to prosecute this action.  The QST has no authority to charge the costs of this action to such Direct Lenders and no authority to act on behalf of the Direct Lenders.

### C.  Texas Rules of Professional Conduct do not Support the QST's position that Duncan Cannot be Paid if he did not do 50% of the Work.

Having established the QST lacks standing, we will now address the particulars of its efforts to concoct a reason not to pay Duncan.  The premise that Duncan must have done 50% of the work to get 50% of the pay is simply false under Texas law.

Comment 12 to Texas Disciplinary Rule of Professional Conduct 1.04 states:

> 12. A division of a fee based on the proportion of services rendered by two or more lawyers contemplates that each lawyer is performing substantial legal services on behalf of the client with respect to the matter. In particular, it requires that each lawyer who participates in the fee have performed services beyond those involved in initially seeking to acquire and being engaged by the client. There must be a reasonable correlation between the amount or value of services rendered and responsibility assumed, and the share of the fee to be received. **However, if each participating lawyer performs substantial legal services on behalf of the client, the agreed division should control even though the division is not directly proportional to actual work performed.** If a division of fee is to be based on the proportion of services rendered, the arrangement may provide that the allocation not be made until the end of the representation. When the allocation is deferred until the end of the representation, the terms of the arrangement must include the basis by which the division will be made.

1    These restrictions on fee splitting are in place "to avoid brokering in clients," C. Wolfram,

2    Modern Legal Ethics § 9.2.4, at 510 (1986).

3    "If lawyers [decide] to divide the fee based on services performed, there are two ways in

4    which they may do so: (1) reasonably forecasting the amount of work each will do at the outset

5    and allocating the fee at the beginning of the representation [or] (2) splitting the fee after work

6    on the case has finished to reasonably correspond to the amount of work each attorney has

7    performed." See *Kummerer v. Marshall*, 971 N.E.2d 198, 202; see also Restatement (Third) of

8    Law Governing Lawyers (2000) § 47(c). "Each lawyer who participates in the fee [must] have

9    performed services beyond those involved in initially being engaged by the client." See

10   Restatement (Third) of Law Governing Lawyers (2000) § 47, comment c.

11   When attorneys forecast the division of labor, several courts have found that all that is

12   required is rough, not exact, proportionality. See *Daynard v. Ness, Motley, Loadholt, Richardson*

13   *& Poole, P.A.*, 178 F. Supp. 2d 9, 23-24 (D. Mass. 2001); *see also Ballow Brasted O'Brien &*

14   *Rusin P.C. v. Logan*, 435 F.3d 235, 242-43 (2d Cir. 2006) ("[I]t has long been understood that in

15   disputes among attorneys over the enforcement of fee sharing agreements the courts will not

16   inquire into the precise worth of the services performed by the parties as long as each party

17   actually contributed to the legal work and there is no claim that either refused to contribute more

18   substantially.") (quoting *Benjamin v. Koeppel*, 85 N,Y.2d 549, 556, 626 N.Y.S. 2d 982, 985, 650

19   N.E.2d 829 (1995).

20   If Duncan played a substantial role in the litigation, and there is no question that he did,

22   then that is the end of the inquiry.  The Court has already found that Duncan did a substantial

23   amount of the work—it awarded fees based on his 1,145 hours of logged time, which did not

24   include management of communications with the Direct Lenders.  Duncan was not a mere

25   broker, but took the bulk of the financial risk in the case.

26   The QST has failed to explain why, all of the sudden, the proportionality of fees issue is

27   at issue.  Since the B&B Direct Lenders made their motion for attorneys' fees on February 3,

28   2011, there have been 19 payments to Duncan and B&B, all made according to the 50/50 split.

The Direct Lenders, and those who have acted on their behalf have clearly waived or are estopped from now asserting the arguments about proportionality.

### D. **The Question of Proportionality and Reasonableness of Attorneys Fees is Not Governed by Rule 56 Standards.**

The QST argues that due to a lack of discovery and the existence of various alleged factual disputes, summary judgment cannot be granted with respect to Duncan's entitlement to attorneys fees. As multiple courts have held, however, "[a] request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437. Rather, courts have broad discretion to make decisions as to attorney fees without a trial or a hearing. *See id.* ("[T]he district court has discretion in determining the amount of a fee award."); *Gates v. Deukmejian*, 987 F.2d 1392, 1398 (9th Cir. 1992) ("The district court has a great deal of discretion in determining the reasonableness of the fee . . . ."); *Grey v. First Nat. Bank in Dallas*, 393 F.2d 371, 388 (5th Cir. 1968) ("[T]he allocation of counsel fees is a question of discretion vested in the District Court."). Indeed, as a result of this grant of discretion, even sizeable attorney fee awards "are routinely made without an evidentiary hearing," let alone a trial. *Walz v. Town of Smithtown*, 46 F.3d 162, 170 (2d Cir. 1995); *see also Richardson v. Brother Int'l Corp.*, 400 F. App'x 284, 287 (9th Cir. 2010) (holding that the trial court's decision not to conduct an evidentiary hearing on the issue of reasonableness was not inconsistent with precedent); *Hamner v. Rios*, 769 F.2d 1404, 1408 (9th Cir. 1985 (holding that "failing to hold an evidentiary hearing on the fee petition was not an abuse of discretion").

The above authorities indicate the Court need not approach questions of the extent and proportionality of attorneys' fees through the summary judgment lens. Summary judgment practice presumes that material issues of fact must be resolved at trial. In matters of awards of attorneys' fees, where the Court has broad discretion, the Court need not hold a trial or even an evidentiary hearing. *See Hamner*, 769 F.2d at 1406 (stating that the decision to rely upon affidavits and the record of the case on a fee petition is within the court's discretion).

### E.  The Alleged Defenses to Payment are Barred by the Statute of Limitations

In an effort to raise an issue of material fact, the QST provides hearsay statements and argues that Duncan is guilty of legal malpractice. *The Real Party in Interest Motion* establishes that such claims cannot be asserted by any party other than the Direct Lenders, as such claims are not assignable. But the malpractice allegations also fail because the statute of limitations for legal malpractice claims has long expired, and not a single direct lender has asserted such a claim against Duncan.

The statute of limitations for legal malpractice claims in Texas is two years. *Willis v. Maverick*, 760 S.W.2d 642, 644 (Tex. 1988). This is true whether the plaintiff pleads the claim in tort, contract, fraud or some other theory. *Streber v. Hunter*, 14 F. Supp. 2d 978, 985 (W.D. Tex. 1998); *Burnap v. Linnartz*, 914 S.W.2d 142, 148 (Tex. App.—San Antonio 1995, writ denied). The Court also is "not bound by the labels the parties place on their claims. . . . [C]haracterizing conduct as "misrepresentation" or "conflict of interest" does not alone transform what is really a professional negligence claim into either a fraud or breach-of-fiduciary-duty claim."*Murphy v. Gruber*, 241 S.W.3d 689, 697.

A legal malpractice claim accrues when the client suffers legal injury, meaning that "facts have come into existence that authorize a claimant to seek a judicial remedy." *Apex Towing Co. v. Tolin*, 41 S.W.3d 118, 120 (Tex. 2001). "A person suffers legal injury from faulty professional advice when the advice is taken." *Murphy v. Campbell*, 964 S.W.2d 265, 270 (Tex. 1997).

Consider the timing of the alleged malpractice. Duncan is alleged (without any competent evidence) to have misled the direct lenders in connection with the formation of the attorney client relationship. This would not be malpractice, as described below. But even if it were, the B&B engagement agreement was signed in 2009, or about 5 years before this action was commenced. The malpractice claims are barred by the statute of limitations.

### F.  The Cangelosi Declaration Fails to Raise Genuine Issues of Material Fact.

The Cangelosi Declaration fails to raise issues of material fact because: 1) most of its contents are hearsay; and 2) what isn't hearsay is irrelevant. Cangelosi's Declaration purports to

present what Michael Collins would say in an affidavit, <u>if only he would say it</u>. Such hearsay is never sufficient proof to raise an issue of fact under Rule 56. In *Murray v. Williams*, ___F.Supp.3d___, 2014 WL 4541483 (D. Nev. 2014), this Court held that it "may only consider properly authenticated, admissible evidence in deciding a motion for summary judgment . . . ." *Id.* at 2. The Court further held that it "will not consider inadmissible hearsay – in an affidavit or elsewhere – to support or defeat summary judgment." *Id.* at 3; see also *Kim v. United States*, 121 F.3d 1269, 1276-77 (9th Cir.1997). Under Fed.R.Civ.P. 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

Even if it were not hearsay, the fictitious declaration does not establish any malpractice on Duncan's part, or any injury to the Direct Lenders. According to Cangelosi, Collins would testify that B&B would have accepted the engagement without Duncan and at a lower contingency fee, that Duncan didn't advance all the costs of the engagement, that B&B thought it unwise for Cross to get involved in loan servicing, that B&B is willing to give the Direct Lenders a discount of fees, that B&B has been aware of objections by Direct Lenders concerning unspecified actions and omissions of Duncan for "quite some time," and that Duncan did not hold funds in his trust account when Direct Lenders complained, so B&B told Cangelosi not to pay any of Duncan's share to B&B.

Duncan does not believe Collins would testify that way, but it does not matter if he would. None of these supposed statements establishes any malpractice on Duncan's part. When B&B and Duncan negotiated their contingency fee arrangement, they did not have a duty to give any particular percentage to the Direct Lenders, or to staff the case only in a particular manner. If B&B would have done the case without Duncan, and at a lower rate (a position Duncan denies), that does not constitute malpractice, or breach of fiduciary on Duncan's part. A lawyer

negotiating a contingency arrangement with a client is acting at arms' length, and not in a fiduciary capacity.[5]

Cangelosi's declaration also fails to provide competent evidence meeting the elements of a fraud claim. To establish fraud, one must establish (1) that Duncan made a false representation, (2) that Duncan knew or believed the representation was false, (3) that Duncan intended to induce the Direct Lenders to act or to refrain from acting in reliance on the misrepresentation, (4) that the Direct Lenders justifiably relied on the misrepresentation, and (5) that the Direct Lenders suffered damages as a result of the reliance. *Bulbman, Inc. v. Nevada Bell*, 108 Nev. 105, 110-11, 825 P.2d 588, 592 (1992).

Cangelosi's Declaration is completely devoid of the substance necessary to raise a genuine issue of material fact that Duncan acted fraudulently toward the Direct Lenders. Take, for example, the following "fact" asserted in Cangelosi's Declaration:

---

[5] *E.g., Setzer v. Robinson*, 368 P.2d 124, 126 (Cal. 1962) (holding that an attorney and client deal at arm's length when agreeing upon the terms of their contract); *Ramirez v. Sturdevant*, 26 Cal. Rptr. 2d 554, 558 (Ct. App. 1994) (noting that "in general, the negotiation of a fee agreement is an arm's-length transaction"); *In re Silverton*, 2001 WL 664251, at *4, *9 (Cal. Bar Ct. May 22, 2001) (holding that negotiation of a fee ordinarily is an arm's-length transaction, but nevertheless finding discipline appropriate for overreaching; *Brillhart v. Hudson*, 455 P.2d 878, 879-80 (Colo. 1969) (affirming the trial court's finding "from the pleadings that the parties entered into a contract, if in fact they entered into any contract, for a contingent fee and were dealing at arm's length and the fiduciary relationship is unimportant in a case of this kind"); *Elmore v. Johnson*, 32 N.E. 413, 416 (Ill. 1892) ("Before the attorney undertakes the business of the client, he may contract with reference to his services, because no confidential relation then exists, and the parties deal with each other at arm's length."); *Edler v. Frazier*, 156 N.W. 182, 184-85 (Iowa 1916) (holding that no confidential relation existed when the parties were negotiating fees because the parties were dealing at arm's length); *Higgins v. Beaty*, 88 S.E.2d 80, 82-83 (N.C. 1955) (noting that when an attorney contracts with his client regarding his fees, parties deal with each other at arm's length); *cf. Lutz v. Belli*, 516 N.E.2d 95,98 (Ind. Ct. App. 1987) ("The facts established by Belli demonstrate that he and Lutz dealt at arm's length. Under these circumstances, the parties were free to fix the compensation at whatever figure they thought proper."); *Tanox, Inc. v. Akin, Gump, Strauss, Hauer, & Feld, L.L.P.*, 105 S.W.3d 244, 264-65 (Tex. App. 2003) (upholding an arbitrator's ruling that fee negotiations between a lawyer and a sophisticated client were conducted at arm's length).

- 15 -

5.      Prior to the Direct Lenders retaining Bickel & Brewer, Duncan told the Direct Lenders that Bickel & Brewer would not represent them unless Duncan was also retained to act as co-counsel.

Nowhere in Cangelosi's Declaration, or in the QST's Opposition, is it alleged that Duncan knew or believed his statement was false, that he intended to induce the Direct Lenders to act in reliance on the statement, that the Direct Lenders did in fact rely on Duncan's statement, or that the Direct Lenders have been damaged because they relied on Duncan's statement.

Instead, Cangelosi and QST merely asserts there is a question "Whether or not Bickel & Brewer required as a condition of its retention that Duncan be retained to provide expertise which B&B did not have and believed it could not obtain for the issues in the 892 litigation and trial[.]"  Posing a question does not create an issue of material fact.  We are faced only with "gossamer threads of whimsy, speculation and conjecture," which this Court has said cannot defeat a motion for summary judgment. *Society of Lloyd's v. Hudson*, 276 F.Supp.2d 1110, 1112 (D. Nev. 2003).

Even if Cangelosi's declaration had established the elements of fraud, the Court could still reject it because it contradicts Cangelosi's own statements.  The evidence before the Court has already established that Cangelosi believed the hiring of B&B and Duncan, under the terms set forth in the engagement letter, was a miracle.  "The impossible has been achieved," she boasted.  (Doc. 141, Ex. 1).  Second guessing whether there was a better deal to be made 6 years later is not a basis to withhold performance on the contract, especially after Duncan bore the financial risk of the litigation, covering hundreds of thousands of dollars out of his own pockets, with no guaranty of getting it back, and after contributing well over a thousand hours into the successful litigation effort.

Because the alleged statements of Collins, even if true, do not create a basis for the QST to withhold funds from Duncan, the Rule 56(d) request is improper.  Rule 56(d) states:

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts ***essential to justify its opposition***, the court may:

(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

As shown above, the purported facts that would be garnered from Collins do not establish a basis for the QST to stop paying Duncan. They do not establish a basis for the Direct Lenders to obtain a discount on the contingency arrangement they negotiated with B&B. The QST has not shown that Collins's deposition will bring out facts "essential to justify its opposition."

After saying what Michael Collins would say if only he would say it, Cangelosi's Declaration raises more questions. No evidence. Just questions. What if Duncan had someone else do the work for which Duncan claimed to have expertise? Why did B&B allow the QST to separately allocate payments to B&B and Duncan? What are the terms of the agreement between Duncan and B&B? How did Duncan and B&B allocate responsibility? More gossamer threads of speculation.

If these questions had any relevance, the QST would not have been making payments to Duncan over the last four years. But they are not relevant. We know the terms of the agreement between Duncan and B&B because they are stated in the engagement letter—a 50/50 split. As to the remaining questions, they are nothing more than speculation, which does not give rise to issues of material fact.

The Cangelosi Declaration next turns to attacking Cross's work—i.e. she speculates Cross was more interested in liquidating properties quickly than in waiting for the real property market to improve. Yet, she does not say that Cross ever took an action that was not approved by a 51% majority. Cangelosi's opinions and speculations do not raise an issue of material fact. First, Cross is no longer a party to the case, and the QST has stated no basis why Cross's alleged actions provide a basis to withhold fees from another person, Duncan.

Second, Cangelosi does not explain why she has been authorizing Duncan's fees for the past four years despite the alleged concerns with Cross. The Motion for Summary Judgment

established that Duncan, with Cangelosi's knowledge and consent, has been paid on 13 occasions since January of 2012, when Cangelosi began complaining about Cross's actions with respect to the Fox Hills and Margarita transactions.

Third, as has been explained to the Court before, Cross was not a traditional "servicer" who made the key decisions on behalf of the Direct Lenders. Cross was hired to assist the Direct Lenders to manage assets themselves. Cross agreed to assist the Direct Lenders, and to take actions on their behalf only if the majority of the direct lender votes approved a course of actions. The Court will recall that Cross was engaged in an agreement titled, Majority Administration and Cooperation Agreement. It states, in relevant part:

1.    Scope. This Agreement is entered into by and between Direct Lender and CROSS. This Agreement is executed for the purpose of facilitating the Direct Lenders administering, owning, holding, assigning, selling, foreclosing, exploring joint ventures, reducing taxes and/or financing of the Loan/ Property.

2.    Management by Direct Lender Majority. Direct Lender acknowledges that Direct Lender invested in a fractionalized investment and therefore is bound by the decisions of the Majority of Direct Lenders who want to take a specific action. This Agreement also binds all Direct Lenders in the Loan to the decisions of the Majority of Direct Lenders who want to take an action with regards to this Loan/Property. **All material decisions concerning the Loan or the Property shall be made by a Majority of Direct Lenders.** Nothing in this Agreement shall be construed to create a partnership, joint venture or employer-employee relationship.

The Direct Lenders also agreed to indemnify Cross against any claims brought against Cross where the Direct Lenders authorized Cross's actions.[6]

Fourth, though Cangelosi has been griping about Cross's actions in the Fox Hills and Margarita loans since January, 2012 (the Direct Lenders did not vote as she wanted), **even in those gripes, Cangelosi acknowledged that Duncan should be paid for the great work he**

---

[6] The MAC agreement states: "CROSS and any director, officer, employee, agent or delegate thereof shall be indemnified and held harmless by Direct Lender against any loss, liability or expense incurred, including reasonable attorneys' fees, in connection with any claim, legal action, investigation or proceeding relating to this Agreement, CROSS's performance hereunder, or any specific action which Direct Lender authorized or requested CROSS to perform pursuant to this Agreement, as such are incurred, except for any loss, liability or expense incurred by reason of CROSS's willful misfeasance, bad faith or gross negligence hereunder."

The MAC agreement has been authenticated in prior moving papers. *See* Doc. 84 at p.56 et. seq.

**did in the litigation.** Attached as Exhibit B-2, to the Declaration of McAlan Duncan, is a January 31, 2012 communication from Cangelosi to the Direct Lenders complaining about Cross's services with respect to those loans.   For statute of limitations purposes, note that the communication predates this lawsuit by more than 2 years—this action was filed on February 27, 2014. Cangelosi states the following in those communications:

- "I am not against any fees earned by Cross, Bickel or Mac Duncan.  I support the tough task Cross has accepted and the great job BB has done thus far." *Id. at 10.*

- "Under the BB engagement agreement, Mac Duncan BB's co-counsel is entitled to millions in fixed fees for winning the waterfall and damages upon liquidation of the loans, irrespective of what we recover.  I don't begrudge a penny of that to Bickel or Mac. However it is Cross' job to assure that we squeeze every penny to be had--from all sources--from these assets, while protecting the Direct Lenders.[7] *Id. at 2.*

Cangelosi, an agent of the QST, cannot create genuine issues of material fact by contradicting herself.  Cangelosi caused Duncan to receive in early 2013, close to $2 million in legal fees, both from the Silar settlement and from several loans that had paid off.  The QST does not explain why Duncan should not be paid now.

The balance of Cangelosi's Declaration asserts, without competent proof, more hearsay statements about the alleged competence of B&B, and what someone named John King said that Duncan said to him about Cangelosi.  These statements are not evidence, and even if true, do not establish a reason why the QST has stopped paying Duncan.

### G. Summary Judgment is an Appropriate Remedy without Discovery.

Much of the Opposition Brief is spent asserting that summary judgment is not necessary because discovery is not yet complete, and that Duncan has admitted that discovery is necessary. Duncan stated discovery was necessary before the Court had dismissed the CRT's and Duncan's claims.  That dismissal materially changed the claims in this case.  The question that remains

---

[7] As explained above, it was not Cross's job to squeeze every penny out of every asset.  It was Cross's job to take action when 51% of the voting interests of the Direct Lenders authorized Cross to take action.

after that dismissal is *What basis does the QST, supposedly a non-partisan holder of funds, have to stop paying Duncan the payments he has been receiving for four years?*  That question does not require full discovery on the dismissed CRT Cross-claims.  Rule 56 states summary judgment is not a post-discovery remedy, but can be asserted "at any time after the expiration of 20 days from the commencement of the action…."  Summary judgment is an effective tool to avoid the expense of discovery when there are no genuine issues of material fact.

<u>**Conclusion**</u>

The QST owes B&B its full share of the contingency fees.  B&B does not object to Duncan's share being paid to Duncan.  The Court should grant summary judgment in Duncan's favor and direct the clerk of the court to disburse the funds on file with the Court to Duncan. The Court should further rule that additional sums due to B&B and Duncan for future tranches of settlement proceeds be paid in the ordinary course, without offset.

DATED this 2 day of March, 2015.

Timothy S. Cory, Esq.
Michael D. Rawlins, Esq.
*Attorneys for McAlan Duncan*

## CERTIFICATE OF SERVICE

I hereby certify that I am an employee of Durham Jones & Pinegar, and that on March 1, 2014 I caused to be served Reply Points and Authorities in the following manner:

[X]    **a.    Electronic Service**

Under Administrative Order 02-1 (Rev. 8-31-04) of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed and served through the Notice of Electronic Filing automatically generated by that Court's facilities.

[ ]    **b.    United States Mail**

By depositing a copy of the above-referenced document for mailing in the United States Mail, first class postage prepaid, at Las Vegas, Nevada, to the parties on the attached mailing matrix at their last known mailing addresses, on the date above written.

[ ]    **c.    Facsimile Transmission**

By facsimile to the facsimile numbers indicated, to those persons listed on the attached service list, on the date above written.  No error was reported by the facsimile machine that I used.

[ ]    **d.    Personal Service**

[ ]    For a party represented by an attorney, delivery was made by handing the documents to the attorney or by leaving the documents at the attorney's office with a clerk or other person in charge, or if no one is in charge by leaving the documents in a conspicuous place in the office, on the date written above.

[ ]    For a party, delivery was made by  handing the documents to the party or by leaving the documents at the person's dwelling house or usual place of abode with someone of suitable age and discretion residing there, on the date written above.

**I declare under penalty of perjury that the foregoing is true and correct.**

Dated: March 1, 2014.

/s/ Michael Rawlins                .
An Employee of Durham Jones & Pinegar